Leonard CHENAULT, Plaintiff,

v.

The WESTERN AND SOUTHERN LIFE INSURANCE COMPANY, Defendant.

No. C-1-76-170.

United States District Court,
S. D. Ohio, W. D.

July 18, 1978.

Ivan L. Tamarkin, Cincinnati, Ohio, for plaintiff.

Roger A. Weber, J. Alan Lips, Cincinnati, Ohio, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW.

HOGAN, District Judge.

This is an action under 42 U.S.C. 2000e, et seq. The plaintiff Leonard Chenault is a Black male. He was employed by the defendant The Western and Southern Life Insurance Company in Cincinnati from September 16, 1974 until June 2, 1975.

He was discharged on the latter date. Shortly thereafter he filed a race discrimination charge with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission. The Ohio Commission investigated the charge, found no probable cause and dismissed the charge. Before the EEOC could review the case, this action was filed.

The plaintiff claims that he was discriminated against because of his race in the following respects:

a) He was trained in a different fashion than Whites, i. e., not as completely.

b) He was placed in a position of sole responsibility before he had received sufficient training and prior to receiving the extent of training that Whites received before being similarly exposed.

c) That he was treated differently by his fellow employees and particularly those in immediate supervision of him.

d) That he was discharged because of his race and in advance of when Whites would have been discharged; alternately, he claims that he was treated different from Whites in respect of being discharged in that it was company policy to transfer rather than discharge people who had rendered unsatisfactory performance in a trainee position.

e) That he was discharged before completing his training period of one year be-

cause he was Black and contrary to company policy.

Prior to his employment at Western and Southern, the plaintiff had worked for General Electric in 1968 and 1969. He entered the Military Service in 1969 and served in Vietnam for 17 months, returning in 1971 and resuming his employment at G.E. He was with G.E. for about a year, during which time he did experience on-the-job difficulties. He left that employment in 1972 and between 1972 and 1974 did work for approximately four other employers.

He was a graduate of Wyoming High School, had been honorably discharged from the Service with an excellent military record.

He was employed by the defendant in its computer "tape library" group of its "Systems Support Division" of the "Electronic Data Processing Department." He was classified as a "tape librarian trainee."

The tape library is the storage place for the computer tapes which contain information used in the defendant's life insurance business. There are many thousands of such tapes, each of which is assigned a number which is designated on the label on the tape's container.

The tape librarians are responsible for storing the tapes in their proper places in the library racks, pulling needed tapes from their storage places when directed to do so, removing and "scratching" (clearing) outdated tapes from the storage, and performing related tasks. It is important that the librarian be accurate. Misfiling and misplacing can and has caused lost computer time and computer errors affecting, among other things, customers' bills and employees' pay.

Employees hired into the tape library department are considered to be trainees for a period of one year.

The plaintiff was the first and only Black tape librarian up to the time of his discharge. The other librarians (approximately five (5) in number) and the Head Librarian were White. At the time plaintiff began work he and one Coleman Brown were the only two Blacks in the systems support division, which consisted of the tape library department and the output operators. About a week before the plaintiff was hired, the defendant executed a voluntary agreement with the Ohio Civil Rights Commission to increase the minority complement of its work force within five years to the percentage of the minority work force in the Cincinnati Metropolitan area. There has been a steady increase until that approximate percentage was reached.

The only person to be hired into or transferred into the tape library since plaintiff's termination was a Black female who experienced no problems in learning and performing the duties and she was still employed in that capacity at the time of trial.

The librarians must perform a number of tasks, some on a daily, some on a weekly, some on a monthly, semi-annual and annual basis. A job calendar is available daily for consultation as to the tasks to be done on any particular day or date. Instruction manuals are maintained for all tasks or jobs, which detail how they are to be performed.

One Freida Smith was the "senior tape librarian" at the time of the plaintiff's employment. She had been the original employee in the library, starting in 1966. She was plaintiff's immediate superior.

Until September of 1971, when second shift coverage began, there was a tape librarian on the first or day shift only. The trainee classification was established in October of 1972. Third shift coverage began in April, 1973.

At the time of Chenault's employment, the tape library staff included, in addition to Mrs. Smith, Deborah Burke, Carolyn Points, Jan Gallespie, Ron McElfresh and Donald Wolf.

There is no evidence of any substance in this case that any of the co-employees treated the plaintiff on a personal basis any differently than they treated each other. It is also clear that there was and is a strong personality conflict between the plaintiff and Freida Smith. It is not related to race.

Freida Smith reported to a Ronald Siemer, the Manager of the Systems Support Division, which also included the computer output control group supervised by Coleman Brown, a Black. James Henson was Assistant Manager of Systems Support.

The plaintiff's first period on the job was spent on the day shift. He then went into a rotation of two weeks on the first shift, one week on the second and one week on the third.

During the period from September to December, 1974, Chenault was trained on the first, second and third shifts. Each day one of the other named librarians was assigned to the training. This training included various types of jobs and it would serve no useful purpose to go into the detail of them. With respect to some of them, a trainee with a normal high school education should be able to perform them after being instructed only once. Others are more complicated. While it would take approximately a year to turn out a fully trained librarian, within a few weeks a normal trainee should be on his own, for general everyday purposes, performing the daily and weekly tasks. That has been the experience with other trainees.

During the plaintiff's first two months of work he was reprimanded for both tardiness and absenteeism. By the end of October, the supervisor Mrs. Smith found it necessary to have Siemer talk to Chenault about his lack of progress. During November of 1974 the plaintiff made more errors than previous trainees of similar experience, required more repetitive instructions, and declined instruction which his supervisor and fellow employees thought necessary. The testimony of this declination is repetitive in this case by many witnesses. While the plaintiff contends that he did not receive normal instruction, it was certainly offered to him and any failure to instruct was due to his declination.

The week of December 9, 1974 the plaintiff was scheduled for the third shift. This was, of course, the night shift and he was scheduled to and did start working that shift alone. It was also his first week alone

on that shift. He had been on it before and trained on it. While most trainees had one or two more months' training before performing on the third shift alone, at least one White employee had been called upon to work the shift alone after substantially less training than the plaintiff and that employee performed the operation successfully. At the end of the third shift on the morning of December 10, ten jobs normally performed during that shift were not completed; only eight of the jobs which were to be performed on the third shift were completed; normally those eight consume four hours. As a result, the plaintiff was formally written up to the level of the Personnel Manager. Conclusorily, the writeup was for unacceptable performance "based on the amount of training"—both quality-wise and quantitywise.

On December 13, 1974, four of the tape librarians—out of the five co-employees—went together to Siemer's office for the purpose of complaining about the plaintiff's performance. The record establishes that the complaints during December, in the described and other fashions, included unexplained absences durationwise and otherwise from his job assignment, excess personal telephone calling, excess visiting. The most serious complaint was that the plaintiff would mark off on the job calendar items as having been done which in fact had not been done.

On December 14, two of the tape librarians who came on duty for the day shift on that Saturday morning reduced to writing a "list of things" . . . "which should have been done" on the third shift the previous night by the plaintiff. The list included eleven matters. While there may be some argument about whether one or two or three were or were not items which the plaintiff should have been able to perform at that time, there is absolutely no question that with respect to another one or two or three, he certainly should have been able to perform.

As a result of the December third shift performance, the plaintiff was, to some extent, monitored for a time in the sense that

Mrs. Smith kept notes on a yellow pad. Those notes included accounts of delay in returning to his office for more than a half hour contra a request by a supervisor; failure to do the job before leaving again for visiting purposes, i. e., the job he was called back to do; visiting in the computer operations department to such an extent that the manager complained to the plaintiff's supervisor; resuming the visiting the next day despite a specific direction not to do so; tardy arrival and declination to indicate why.

As a result of the above, and on December 26, 1974 Siemer placed the plaintiff on "final warning status." The plaintiff was informed of this in writing and further informed that during the time of his employment his performance, advancement, attendance and punctuality had been unacceptable, as had his failure to improve after being informed of the deficiencies. The plaintiff was informed at that time that lacking demonstrable improvement in the immediate future, dismissal would result.

At that time, as well as with frequence during all times of interest during his employment, plaintiff rebuffed offers for further instruction on the ground that he knew all about the job and it was an easy one.

Around the first of the year 1975, the plaintiff asked to be assigned to permanent second shift in order that he could attend college during the day. This was arranged and he went on permanent second shift on January 6, 1975.

On February 10, 1975, the plaintiff received an employee salary review in the course of the general practices of the defendant. Mrs. Smith did the rating and the rating was concurred in by Siemer. He did not receive a salary increase. On a scale of a–e, his proficiency was graded "d" in quality of work, quantity of work, human relations and progress. He was listed as proficient in several respects and as needing improvement in a number of respects, which included attendance, punctuality and accuracy. He was considered unqualified for higher level work and acceptable for the work he was doing. It was noted on the salary review form that he was on final warning as of December 26, 1974.

The salary review result was the subject of a conversation or meeting between Mrs. Smith and Chenault. The plaintiff was informed that further improvement would have to be forthcoming if he were to attain permanent status and that the final warning position was unchanged by the review.

The record establishes that other trainees in the unit survived "d" or "e" ratings and went on without discharge to permanent positions. The record does not deal with the performance of those people after the ratings, nor does it indicate whether they were or were not in a final warning position at the time of the ratings. The record does indicate that after February of 1975 other librarians continued to complain about the plaintiff's performance in the areas which have previously been dealt with and that the visiting and telephoning and tardiness items continued.

This record is devoid of any evidence that the plaintiff ever requested any particular instruction or training in any area and was declined; on the contrary, it is replete with evidence that he consistently declined training on the ground he did not need it. While there is evidence that he did work second shift alone under circumstances different from other employees, it is uncontradicted that he requested that shift and there is no indication that other comparable employees had ever so done. The plaintiff's working alone on the second shift was not due to any dislike or ill-treatment, but was due to the fact that he did so request to work on that shift and there is no indication that it was unusual for any trainee to work that shift alone.

During March and April of 1975, Henson received three complaints from another division respecting the plaintiff's performance. Henson and Smith, as a result of those complaints, called in the plaintiff and pointed out to him at that time (a) the substance of the complaints, which amounted to a failure to follow standard procedure in furnishing scratch tapes; (b) that he had failed also to make any improvement in

respect of job calendar updates; (c) that he had continued to charge out the wrong tapes; (d) that he had been spending too much time on the telephone. At that time the plaintiff denied responsibility, minimized the alleged mistakes, and in general challenged the judgment of the Assistant Manager.

The complaints continued after the end of April on into May; some were documented. Mrs. Smith made a list of jobs which the plaintiff should have performed on May 22nd but did not, and the same is true of May 27th. On May 29th or thereabouts, a memo was prepared by Mrs. Smith, copy of which is attached hereto and incorporated herein. (It is marked Defendant's Exhibit 11.) It correctly sums up the situation as it then existed.

There is no evidence in this case at all that any White employee performed as deficiently as described in these findings (either in the period immediately preceding December 26, 1974 or in the period preceding May 29, 1975.) In other words, there is no comparable in this case to compare with for purposes of "discrimination." It is quite true that there is a great deal of evidence in this case that White employee A was deficient in a respect and survived and/or that B was deficient in another and survived, etc. There is no evidence at all that anybody who had even one-half the deficiency problems that the plaintiff had survived. And, of course, the plaintiff himself does not question the deficiency, but the plaintiff's position is either that they were too trivial to amount to anything or, if they were not, that they were condoned in other people. The problem is that the condonements are not comparable because the deficiencies are not comparable, that is to say, there is no evidence of comparable deficiencies.

During the plaintiff's employment with the defendant, he was either absent or late one day out of every ten. His termination was recommended at the end of May by Siemer and was based on the occurrences described in these findings. There is no evidence of any racial antipathy on Siemer's part toward the plaintiff or anybody else. The recommendation was adopted by a committee of the defendant composed of three executive officers. There is no evidence of any racial antipathy by any of these three involving the plaintiff or anyone else. All three concurred in the proposed termination and on June 2nd the plaintiff was terminated. He was so informed and that the reason was "unsatisfactory job performance."

The Chenault vacancy was not filled. This was "in view of the fact that it takes several months to give a new employee initial training in the tape library before he or she can be useful" and the anticipation that within the several months' period a systems change would reduce the need for personnel.

For the purpose of this case, a Western and Southern employee on final warning was in the same status as an employee on probation. An employee in such a situation has a reasonable period of time to correct his problem; if the problem continues or the record deteriorates, the result will be termination; an employee in such a status is not eligible for salary increases or promotion; the status will be changed only after significant improvement is demonstrated; a recurrence of the problem after the status is changed may result in termination without notice. The employees of the defendant are informed of the above.

The plaintiff made no effort to get a transfer to another department by request or otherwise, nor did the defendant transfer him to any other department. While there is evidence that one White employee who did not turn out satisfactorily as a tape librarian trainee was transferred at the end of the year to another position in the company, that employee had been employed at the company for approximately three years before starting in the tape library and the previous record in the other jobs was satisfactory.

At the time of his discharge, the plaintiff was being paid a base salary of $105.00 per week, which escalated to $119.00 in one

rotation and to $125.00 in another rotation. Between June 2nd of 1975 and August of 1976, he was (a) on unemployment compensation for a period during which he received $1,480.00; (b) was in part-time employment for a while in which he earned $750.00; (c) unemployed the rest of the time. He was employed at Fisher Body in Hamilton, Ohio, in September, 1976, as a fork lift operator, earning in excess of $400.00 a week. He has no trouble in that type of employment.

The plaintiff was an employee at will of the defendant. The trainee classification has not to do with tenure but eligibility for salary scale.

## CONCLUSION

The preponderance of all the evidence in this case establishes that the defendant did not discharge or otherwise discriminate against plaintiff because of his race. The discharge was for cause unrelated to race.

### DEFENDANT'S EXHIBIT NO. 11

May 29, 1975

TO: Mr. Ronald Siemer
Manager
Systems Support

FROM: Freida Smith
Sr. Tape Librarian
Systems Support

SUBJECT: Leonard Chenault

After much thought and consideration I have come to the following conclusion. I feel that Mr. Chenault is not performing his share of the duties of the Library and I am not satisfied with his progress toward becoming a Librarian. The following facts and observations are the reasons upon which I have based my decision.

I have been receiving complaints from Leonard's fellow workers that he is not doing his share of the work and that much that he is accomplishing is incorrect.

Also complaints have come from operators that he does not always supply the tape files needed for a particular job, then upon asking him for it he would not endeavor to look for it.

I have talked to Leonard on numerous occasions and related to him that the above complaints were coming to me but he would always deny them and always tried to argue the fact of what he did do. However, I continually related to him that what he was doing was not enough.

I personally took Leonard to the scratch rack and showed him that 1900 and below numbered tapes were older and that they should never be used for Logic. However, when the job came up on the calendar to take 40 tapes to Logic, Leonard took out 40 tapes and out of the forty, 26 of them were in the 1900 range. This happened 5 times. Logic had serious problems because of this error.

I have received documentation from some of his co-workers concerning the work. On May 22, from Third Shift people, a list of jobs that could have been accomplished and was not follows:

1. 33 tapes to be stored. They were test tapes created and had storage sheets with them.

2. Benefit Analysis System tapes to be scratched.

3. Secure the daily tape files for the FORMS Weekly Audit Trail.

5. The SACM # 2 Update.

6. There were 8 stacks of tapes on the storall to be put in their respective area.

7. Our card files which represent the charged out tapes and also the test tapes stored but yet to be key punched are to be kept in volume serial number order that we may readily check on a particular tape file. These were not in order at the start of Third Shift.

8. The WPFYCS update was not completed. One of these files was in the WISP truck.

**584**

Then again on May 27 I received a list of unaccomplished duties from Third Shift.

1. The WPFM Weekly Update was not accomplished.
2. The WPFYCS Study Update # 1 not completed.
3. R.O. 2 Yr. Lapse Rate not accomplished.
4. WISP Checkout not accomplished.
5. 99 tapes on storall to be stored.
6. Card files not in order.
7. X rack not emptied—there were only 9 jobs on the table to be processed at the beginning of Third Shift.
8. Scratches still on storall to be put in respective places.
9. No scratches completed on Second Shift.

Now from my own personal observations—When I came in Monday morning our scratch listing was on the desk with the thin copies as well as the hard copies and the IBM cards. The listing had been gone thru and X's and check marks were beside a number of the inventory numbers. No explanation was available. It was necessary for me to go thru the entire report which took me from 7:30 till 11:30 to correct and reconcile the errors. I found that cards that were marked for a change, 17 in number, had been run thru the uncatalogue procedure in error. It is necessary to contact Programming in order to get these files back out on the O.S. catalogue. There were about 55 or 60 thin copies to be filed in the groups of thin copies. These had been given personally to Leonard by Bill Fairbanks at the end of First Shift and Bill reminded Leonard that they must be filed in. However, he did not do that. I also found one IBM card pulled in error. Leonard had not restored this file in anyway. It must be pulled, placed back on our disc and also returned to our file. Two hard copies had been pulled in error. He had left them in the hard cards and they would have been destroyed. All in all, it was a mess.

I also observed with Leonard the problem of communication. When I would try to explain something to him he would always tell me he knew the job and that it was easy. I believe he never accepted the importance of training and learning to have the right tape at the right place at the right time.

Another thing that really concerned me also was he did not keep the operators supplied with scratch tapes, and they would not get the scratches either; Therefore the supervisor, on occasion, had to fill the scratch racks.

I am available at your request for any further information that I can give.

FS:dm

CC: Messrs. L. Henson
 K. Palmer
 T. Schneider